JS - 6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAROLE MOLLOY, an individual, | ) CASE NO. CV 09-02614 MMM (AGRx) |
| Plaintiff, | ) |
| vs. | ) ORDER GRANTING DEFENDANTS' |
| | ) MOTION TO TRANSFER VENUE |
| RK NETMEDIA, INC., a Florida Corporation; NET 227, INC., a Florida Corporation; NAMECHEAP, INC., a Delaware Corporation; EDDIE COLLINS, an individual; SCORCHING SANDS, INC., a Florida Corporation; ADAM NALEPOWSKI, an individual; MICHAEL PUSZKARZ, an individual; T. KGELS, an individual; LLR ADVERTISING, INC., a Florida Corporation; and DOES 1-10, inclusive, | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

On April 15, 2009, plaintiff Carole Molloy commenced this action against defendants RK

Netmedia, Inc., Net 227, Inc., Namecheap, Inc., Eddie Collins, Scorching Sands, Inc., Adam

Nalepowski, Michael Puskarz, T. Kgels, LLL Advertising, Inc., and fictitious defendants,

asserting nine causes of action: (1) trademark infringement under 15 U.S.C. § 1114; (2) federal

trademark dilution under 15 U.S.C. § 1125(c); (3) false designation of origin and unfair

competition; (4) contributory trademark infringement; (5) cybersquatting in violation of 15 U.S.C. § 1125(d); (6) cybersquatting in violation of 15 U.S.C. § 1129; (7) cybersquatting in violation of California Business & Professions Code § 17525; (8) common law misappropriation of likeness; and (9) commercial misappropriation of likeness under California Civil Code § 3344.  On July 23, 2009, defendants RK Netmedia, Inc. and LLL Advertising, Inc. filed a motion to dismiss for improper venue under Rule 12(b)(3) of the Federal Rules of Civil Procedure.  Alternatively, defendants seek to dismiss under 28 U.S.C. § 1406(a), stay the proceedings under 9 U.S.C. § 3, or transfer venue to the Southern District of Florida under 28 U.S.C. § 1406(a) or 28 U.S.C. 1404(a).

## I.  FACTUAL BACKGROUND

Plaintiff Carole Molloy is an adult-entertainment actress, dancer, and model, who has used the name "Flower Tucci" as a professional pseudonym since August 1, 2002.[1]  Molloy has performed in over four hundred adult films under this name.[2]

Defendant LLL Advertising, Inc. ("LLL") is a Florida corporation, which creates and distributes adult-oriented, audio-visual productions.[3]  Since 2001, LLL has had an affiliate program, through which it works with other on-line, adult-entertainment distributors.[4]  In late 2006, LLL initiated contract negotiations with Molloy to secure her services as a performer in

---

[1]Complaint, ¶¶ 3–4.

[2]Complaint, ¶ 24.

[3]Defendants' Motion to Dismiss Complaint for Improper Venue or in the Alternative for a Transfer of Venue ("Defs.' Motion") at 3.

[4]Declaration of Mike Imber ("Imber Decl."), ¶ 5.

2

adult productions on an exclusive basis.[5]  Molloy, who did not graduate from high school,[6] works with a manager, Mark Spiegler, who was also involved in the discussions with LLL.[7]

Molloy contends that during the negotiations, she expressed concern regarding the exclusivity restrictions in the agreement because she had already agreed to perform three scenes for a different production company, Elegant Angel.[8]  She asserts that LLL assured her that performance of this limited number of scenes for Elegant Angel would not breach the contract.[9] LLL disputes that Molloy advised that she had agreed to perform scenes for another production company and contends that it did not authorize her to do so.[10]  According to LLL representative, Justin Lally, the final terms of the exclusive performance agreement were discussed with Molloy at a dinner in mid-January 2007; Lally contends that Molloy approved all aspects of the contract at that time, and received a necklace from LLL.[11]  Molloy counters that she was presented with the contract on a "take-it-or-leave-it" basis just before she was to perform a scene in California.[12]

Under the agreement, Molloy was to be paid $130,000 a year – which Molloy contends is twice the industry standard for such an agreement – together with a $5,000 signing bonus.[13]

---

[5]Declaration of Justin Lally ("Lally Decl."), ¶ 2; Declaration of Carole Molloy in Support of Plaintiff's Opposition to Motion to Dismiss or in the Alternative to Transfer ("Molloy Decl."), ¶ 6; Declaration of Mark Spiegler in Support of Plaintiff's Opposition to Motion to Dismiss or in the Alternative to Transfer ("Spiegler Decl."), ¶ 4.

[6]Molloy Decl., ¶ 5.

[7]Spiegler Decl., ¶¶ 1, 4, 5, 6.

[8]Molloy Decl., ¶ 8.

[9]*Id.*

[10]Imber Decl., ¶ 3; Lally Decl., ¶ 4.

[11]Lally Decl., ¶ 3.

[12]Molloy Decl., ¶¶ 7, 9.

[13]Plaintiff's Opposition to Motion to Dismiss or in the Alternative to Transfer ("Pl.'s Opp.") at 4.

Once LLL believed Molloy had agreed in principle to the terms of the exclusive performance contract, it purchased the domain name "www.flowertucci.com" from Aligned Acquisitions for $10,087.75.[14]

Prior to signing the exclusive performance agreement, Molloy signed a contract ("Model Release") on January 25, 2007, which concerned her performance that day in a production filmed in Woodland Hills, California.[15]  The Model Release was also signed by a producer, whom LLL identifies as Matthew Lenz.[16]  LLL contends that Lenz was a contractor who executed the agreement on LLL's behalf.[17]  The Model Release contains an arbitration provision, which requires that

> "[a]ll disputes between [Molloy] and Producer (and their respective attorneys, successors and assigns) of any kind whatsoever, arising from the transaction reflected in this Agreement . . . shall be resolved by arbitration. . . .  Any arbitration hearing shall occur in Miami-Dade County, Florida, unless otherwise ordered by the Arbitrator or agreed by the parties."

Section 5(a) of the release, captioned "Additional Rights Granted by [Molloy]," states:

> "[Molloy] further grants to Producer the perpetual but nonexclusive right to use, and to license to others to use, [Molloy]'s name and biography and reproductions of [Molloy]'s physical likeness and/or voice for the purpose of advertising and exploiting an[y] work embodying the Performance and/or Audio Portion; and the use of any of the rights herein granted for commercial advertising or publicity (including endorsements) in connection with any product, commodity or service

---

[14]Declaration of Mauricio Botero ("Botero Decl."), ¶¶ 2, 3; Defendants Reply re Plaintiff's Opposition to Motion to Dismiss or in the Alternative to Transfer ("Defs.' Reply"), Exh. 3.

[15]Defs.' Motion, Exh. 1.  Attached to the Model Release is a compensation schedule that indicates the date, time, and location of the performance covered by the release.

[16]Imber Decl., ¶ 8.

[17]*Id.*

4

manufactured, distributed or offered by Producer."[18]

Section 5(c) of the Model Release states:

> "In connection with the marketing of the Project, [Molloy] grants Producer the right to use Model's stage name, and any other names that Model has used in the past or may use in the future, including those which may be trademarked."[19]

The day after she executed the Model Release, Molloy and LLL President Mike Imber signed the exclusive performance contract ("Services Agreement").[20]  At some point, LLL assigned rights under the contract to RK Netmedia, Inc.[21]  The Services Agreement contains an arbitration clause, which states:

> "Any controversy or claim arising out of or relating to this Agreement or any breach thereof shall be settled by binding, confidential arbitration in accordance with the rules of the American Arbitration Association; and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.  The prevailing party shall be entitled to reimbursement for costs and reasonable attorneys' fees.  The determination of the arbitrator in such proceeding shall be final, binding and non-appealable.  In the event of any breach of this Agreement, the prevailing party shall be limited to the prevailing party's remedy at law for direct damages (after the prevailing party's good-faith efforts to mitigate such damages), if any, and the prevailing party shall not have the right to seek consequential or punitive damages, or, in the event that [Molloy] is the prevailing party, [Molloy] shall not be entitled to enjoin or restrain in any way the production, distribution, advertising or exploitation of the Content.  Any arbitration provided

---

[18]Defs.' Motion, Exh. 1.

[19]*Id.*

[20]Defs.' Motion, Exh. 2.

[21]Imber Decl., ¶ 8.

for herein shall be held in Miami-Dade County, Florida."[22]

A separate "Jurisdiction; Venue" provision in the Services Agreement states:

> "This Agreement shall be construed pursuant to the laws of the State of Florida. Any action brought hereunder to enforce or confirm the arbitration provision . . . shall be subject to the exclusive jurisdiction of a Court of competent jurisdiction located in Miami-Dade County, Florida."[20]

The Services Agreement also contains an assignment clause, which provides that the

> "Producer shall have the right to assign this Agreement and any of the rights granted herein, in whole or in part, to any person, firm, corporation or entity, and nothing contained herein shall imply anything to the contrary."[21]

Molloy contends that during the four months that followed execution of the Services Agreement, she performed in forty productions for LLR.[22] LLL asserts that in May 2007, Molloy breached the contract by performing scenes for Elegant Angel.[23] LLL terminated Molloy's services shortly thereafter for cause.[24]

On May 6, 2008, Flower Tucci Entertainment, Inc., a Nevada corporation, registered a trademark for "Flower Tucci" ("the Mark") with the U.S. Patent and Trademark Office.[25] On March 31, 2009, the Trademark Office registered an assignment of rights in the Mark by Flower

---

[22]Defs.' Motion, Exh. 2 at 31.

[20]*Id.* at 32.

[21]*Id.* at 30.

[22]Pl.'s Opp. at 4–5.

[23]Molloy contends that the scenes she performed for Elegant Angel were the scenes that she discussed with LLL during contract negotiations, and that LLL authorized her to perform. Molloy Decl., ¶¶ 8, 16.

[24]Declaration of Jessica Kone ("Kone Decl."), ¶ 2.

[25]Complaint, Exh. A.

Tucci Entertainment, Inc. to Carole Molloy.[26]  Molloy contends that she has used the Mark continuously in her professional career and that, through her efforts, the Mark has achieved a distinctive and valuable reputation and a degree of goodwill.[27]

Molloy alleges that defendants other than LLL and RK registered various website domain names, all of which incorporate some portion of the "Flower Tucci" Mark, and contain advertising or links to www.flowertucci.com, which is owned and operated by LLL and RK.[28] Molloy alleges that these activities constitute direct and contributory trademark infringement and seeks damages as well as an injunction restraining the infringing activities.[29]  RK and LLL contend that under the Model Release and Services Agreement, they have the right to use the Mark to market and distribute content.[30]  They also maintain that Molloy's claims must be arbitrated in Miami-Dade County, Florida.[31]

## II.  DISCUSSION

**A.    Defendants' Standing to Enforce the Arbitration Provisions of the Services Agreement and Model Release**

Defendants' motion to dismiss, stay, or transfer the action is based on the Services Agreement and Model Release, both of which, they assert, contain arbitration and venue clauses

---

[26]Complaint, Exh. B.  Defendants maintain, without evidentiary support or citation of authority, that the assignment was fraudulently made. (Defs.' Motion at 3 n. 2.)  Molloy, however, has proffered prima facie evidence that Flower Tucci Entertainment executed an assignment in her favor.  See Pl.'s Opp., Exh. 1 and 2; see also 15 U.S.C. § 1060(a)(3) (providing that an assignment registered with the Trademark Office "shall be prima facie evidence of execution").   Because defendants adduce no evidence challenging the validity of the assignment, the court declines to address the issue further.

[27]Complaint, ¶ 23–24.

[28]Id., ¶¶ 25–36.

[29]Id., ¶¶ 37, 38.

[30]Defs.' Motion at 3–4.

[31]Id. at 2–7.

that govern Molloy's claims against them.[32] Molloy contends that RK lacks standing to enforce the Services Agreement because no RK representative was a signatory to the contract.[33] She also contends that that neither LLL nor RK has standing to enforce the arbitration provision in the Model Release because the contract was signed by a producer who did not identify himself as executing the contract on behalf of either company.[34]

The Federal Arbitration Act ("FAA") provides that written arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. In enacting the FAA, Congress "declared a national policy favoring arbitration" that was intended to reverse centuries of judicial hostility to arbitration agreements. *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984); see *also Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 475 n. 8 (9th Cir. 1991) ("The Federal Arbitration Act of 1925 . . . reflects the strong Congressional policy favoring arbitration by making such clauses 'valid, irrevocable, and enforceable,'" quoting 9 U.S.C. § 2).

As a result, the FAA requires courts to "rigorously enforce agreements to arbitrate." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221 (1985); *id.* at 218 ("By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed," citing 9 U.S.C. §§ 3,4 (emphasis original)); see also *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 22–23 (1983).

Despite this strong policy favoring arbitration, "'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Howsam v. Dean Witter Reynolds*, 537 U.S. 79, 83 (2002) (quoting *Steelworkers v. Warrior & Gulf Navigation* Co., 363 U.S. 574, 582 (1960)); see also *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (explaining that "arbitration is simply a matter of

---

[32]Defs.' Motion at 2.

[33]Pl.'s Opp. at 6.

[34]*Id.* at 6.

contract between the parties; it is a way to resolve those disputes – but only those disputes – that the parties have agreed to submit to arbitration"); *Mundi v. Union Security Life Insurance Co.*, 555 F.3d 1042, 1046 (9th Cir. 2009) ("[O]nly those who have agreed to arbitrate are obliged to do so"); *Van Ness Townhouses v. Mar Indus. Corp.*, 862 F.2d 754, 756 (9th Cir. 1989) ("When we are asked to compel arbitration of a dispute, our threshold inquiry is whether the parties agreed to arbitrate"); *McAllister Bros., Inc. v. A & S Transp. Co.*, 621 F.2d 519, 524 (2d Cir. 1980) ("[T]he question whether a person is a party to (an) arbitration agreement . . . is included within the statutory issue of the making of the arbitration agreement" (citation and internal quotation marks omitted)).[35]

When evaluating whether a party is bound by an arbitration agreement or can enforce it, "the liberal federal policy regarding the scope of arbitrable issues is inapposite." *Comer v. Micor, Inc.*, 436 F.3d 1098, 1104 n. 11 (9th Cir. 2006); *Chastain v. Union Security Life Insurance Co.*, 502 F.Supp.2d 1072, 1075 (C.D. Cal. 2007) (where the issue is whether parties are bound by an arbitration agreement, "the Court is not bound by [the] . . . policy encouraging arbitration in reviewing plaintiffs' motion"). The issue is instead determined according to ordinary principles of contract law. *E.E.O.C. v. Waffle House*, 534 U.S. 279, 293 (2002) (in deciding whether a valid agreement to arbitrate exists, federal courts must "place arbitration agreements on equal footing with other contracts"); *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003) ("to evaluate the validity of an arbitration agreement, federal courts 'should apply ordinary state-law principles that govern the formation of contracts,'" quoting *First Options of Chicago, Inc.*, 514 U.S. at 944)); see also *Fleetwood Entertainments, Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002) ("[The] federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties; instead

---

[35]While neither party has filed a motion to compel arbitration, LLL's and RK's ability to enforce the arbitration provisions in the Model Release and Services Agreement is dispositive of the pending motion to dismiss. Although the parties dispute whether the court could compel arbitration given the venue provisions included in the arbitration agreements, the court need not decide the issue as no party has asked the court to order the dispute to arbitration.

1  '[o]rdinary contract principles determine who is bound,'" quoting *Daisy Manufacturing Co. v.*

2  *NCR Corp.*, 29 F.3d 389, 392 (8th Cir. 1994)); *Flores v. Jewels Marketing and Agribusiness*, No.

3  CIV F 07-334 AWI WMW, 2007 WL 2022042, *6 (E.D. Cal July 9, 2007) (same).  Accordingly,

4  arbitration agreements "are subject to all defenses to enforcement that apply to contracts

5  generally."  *Ingle*, 328 F.3d at 1170.

6  As noted, "[g]enerally, 'arbitration is a matter of contract and a party cannot be required

7  to submit to arbitration any dispute which he has not agreed so to submit.'"  *International Paper*

8  *Co. v. Schwabedissen Maschinen & Analgen GMBH*, 206 F.3d 411, 416 (4th Cir. 2000) (quoting

9  *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960)).  The Ninth Circuit

10  has recognized an exception to this rule, however, which allows certain non-signatory parties to

11  enforce arbitration agreements under ordinary contract or agency principles.  See *Comer*, 436

12  F.3d at 1101 ("[W]e explained that 'nonsignatories of arbitration agreements may be bound by

13  the agreement under ordinary contract and agency principles,'" quoting *Letizia v. Prudential*

14  *Bache Securities, Inc.*, 802 F.2d 1185, 1187–88 (9th Cir. 1986)).  Among the contract/agency

15  principles that apply "are '1) incorporation by reference; 2) assumption; 3) agency;

16  4) veil-piercing/alter ego; and 5) estoppel.'"  *Id.* (quoting *Thompson-CSF, S.A. v. Am. Arbitration*

17  *Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995)).

18  Thus, for example, non-signatory successors in interest to a contract are able to enforce

19  an arbitration provision contained in the agreement.  See *Newport Petroleum v. Tug Justine Foss*,

20  C97-966C, 1997 WL 876955, *1 (W.D. Wash. Sept. 2, 1997) ("A successor in interest can

21  enforce an arbitration clause in a contract signed by its predecessor," citing  *Matter of Chicago,*

22  *Milwaukee, St. Paul, & Pacific R.R.*, 789 F.2d 1281, 1282 (7th Cir. 1986)).

23  LLL is a party to and signatory of the Services Agreement.[36]    LLL's President, Mike

24  Imber, moreover, has submitted a declaration stating that LLL assigned rights under the Services

25  Agreement to RK.[37]  Section 17 of the Services Agreement authorizes LLL to assign its rights

26

27  [36]Defs.' Motion, Exh. 2 at 31.

28  [37]Imber Decl., ¶ 8.

1    under the contract "in whole or in part."[38]  Thus, LLL's assignment of some or all of its rights

2    under the contract to RK was valid, and entitles RK to enforce the arbitration and venue

3    provisions in the agreement.  As for the Model Release, Imber states that Matthew Lenz, the

4    producer who signed the release, was "an LLL contractor who executed the agreement on LLL's

5    behalf."[39]  LLL, therefore, was a party to the Model Release and may enforce its provisions.

6    Although the arbitration provision in the Model Release specifically extends rights to "successors

7    and assigns,"[40] defendants do not assert that LLL's rights under that contract were assigned to

8    RK.

9         Accordingly, both LLL and RK have standing to enforce the provisions of the Services

10   Agreement, and LLL has standing to enforce the provisions of the Model Release.

11   **B.    Whether Arbitration-Related Venue Provisions Can Be Construed as Venue**

12   **Selection Clauses for Purposes of Rule 12(b)(3)**

13   "A motion to enforce a forum-selection clause is treated as a motion pursuant to Federal

14   Rule of Civil Procedure 12(b)(3)."  *Kukje Hwajae Ins. Co., Ltd. v. M/V Hyundai Liberty*, 294

15   F.3d 1171, 1174 (9th Cir. 2002); see also *Argueta v. Banco Mexicano, S.A.*, 87 F.3d 320, 324

16   (9th Cir. 1996) ("We conclude that we should treat Banco Mexicano's motion [to enforce a forum

17   selection clause] as a Rule 12(b)(3) motion to dismiss for improper venue").  "Under the Supreme

18   Court's standard for resolving motions to dismiss based on a forum selection clause, the pleadings

19   are not accepted as true, as would be required under a Rule 12(b)(6) motion."  *Argueta*, 87 F.3d

20   at 324.  See also *Murphy v. Schneider Nat'l., Inc.*, 362 F.3d 1133, 1137 (9th Cir. 2004) (in

21   deciding a Rule 12(b)(3) motion based on a forum selection clause, "the pleadings need not be

22   accepted as true, . . . and the court may consider facts outside of the pleadings" (citation

23   omitted)); *Kukje Hwajae*, 294 F.3d at 1174 ("the pleadings need not be accepted as true, and facts

24   outside the pleadings properly may be considered").  Nonetheless, "the trial court must draw all

25   _____

26        [38]Defs.' Motion, Exh. 2 at 34.

27        [39]*Id.*

28        [40]Defs.' Motion, Exh. 1 at 19.

reasonable inferences in favor of the non-moving party and resolve all factual conflicts in favor of the non-moving party. . . ." *Murphy*, 362 F.3d at 1138.

"The party challenging the clause bears a 'heavy burden of proof' and must 'clearly show that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or over-reaching.'" *Id.* at 1140 (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 12 (1972)). Only if the non-moving party adduces evidence that, viewed in the light most favorable to her, meets this "heavy burden" should the district court deny the motion pending resolution of the disputed facts.[41] *Id.*

In requesting dismissal under Rule 12(b)(3), LLL and RK rely on venue provisions that, by their terms, concern the venue of arbitration proceedings.[42] The arbitration clause in the Services Agreement states that "[a]ny controversy or claim arising out of or relating to this Agreement or any breach thereof shall be settled by binding, confidential arbitration . . . . Any arbitration provided for herein shall be held in Miami-Dade County, Florida."[40] A separate venue provision in the Services Agreement states that "[a]ny action brought . . . to enforce or confirm the arbitration provision . . . shall be subject to the exclusive jurisdiction of a Court of competent jurisdiction located in Miami-Dade County, Florida."[41]

---

[41]If there are factual disputes as to whether the non-moving party has met this "heavy burden," the district court has broad discretion in deciding how to resolve the dispute. As the *Murphy* court explained: "[I]t may be appropriate for the district court to hold a Rule 12(b)(3) motion in abeyance until the district court holds an evidentiary hearing on the disputed facts. . . . Whether to hold a hearing on disputed facts and the scope and method of the hearing is within the sound discretion of the district court. Alternatively, the district court may deny the Rule 12(b)(3) motion while granting leave to refile it if further development of the record eliminates any genuine factual issue. . . . Upon holding an evidentiary hearing to resolve material disputed facts, the district court may weigh evidence, assess credibility, and make findings of fact that are dispositive on the Rule 12(b)(3) motion. These factual findings, when based upon an evidentiary hearing and findings on disputed material issues, will be entitled to deference." *Murphy*, 349 F.3d at 1139-40 (internal citations omitted).

[42]Defs.' Motion at 7–9.

[40]Defs.' Motion, Exh. 2 at 31.

[41]*Id.* at 32.

While the Model Release does not contain a separate venue provision, the arbitration clause provides that "[a]ll disputes between [Molloy] and Producer (and their respective attorneys, successors and assigns) of any kind whatsoever, arising from the transaction reflected in this Agreement . . . shall be resolved by arbitration. . . .  Any arbitration hearing shall occur in Miami-Dade County, Florida, unless otherwise ordered by the Arbitrator or agreed by the parties."[42]

Molloy contends that these provisions do not control whether this action is properly venued in the Central District of California.[43]  As respects the provision in the Services Agreement that references Miami-Dade County courts, she asserts that it concerns only actions to enforce the arbitration clause or confirm an arbitration award, and that it is not broadly applicable to other types of litigation between the parties.[44]

In *Scherk v. Alberto-Culver*, 417 U.S. 506, 519 (1974), the Supreme Court held that an "agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute."[45]  As part of an international business transaction that included the transfer of trademark rights, the parties in *Scherk* contractually agreed that "'any controversy or claim [that] shall arise out of this agreement or breach thereof' would be referred to arbitration before the International Chamber of Commerce in Paris, France . . . ."  *Id*. at 508.  Holding that the agreement's arbitration clause, including its venue provision, was enforceable, the Court referenced its earlier decision in *Bremen*, noting that it had in that case "concluded that a 'forum clause should control absent a strong showing that it should be set aside.'" *Id*. at 518 (quoting

[42]Defs.' Motion, Exh. 1 at 20.

[43]Pl.'s Opp. at 17–18.

[44]*Id*.  As Molloy notes, defendants base their arguments almost exclusively on the provisions of the Services Agreement.

[45]In dicta, the Court noted that "[u]nder some circumstances, the designation of arbitration in a certain place might also be viewed as implicitly selecting the law of that place to apply to that transaction."  *Scherk* , 417 U.S. at 519 n. 13.

1    *Bremen*, 407 U.S. at 15).   The Court expressed concern about undermining contractual

2    agreements regarding venue, stating "[t]he invalidation of such an agreement in the case before

3    us would not only allow the respondent to repudiate its solemn promise but would, as well, reflect

4    a 'parochial concept that all disputes must be resolved under our laws and in our courts.'" *Id.*

5    (quoting *Bremen*, 407 U.S. at 9).   Later Supreme Court decisions interpreted *Scherk* as holding

6    that arbitration agreements "are but a subset of . . . forum selection clauses in general."   See

7    *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 534 (1995).   See also

8    *Haynsworth v. The Corporation*, 121 F.3d 956, 963 (5th Cir. 1997) (citing *Vimar Seguros*, and

9    noting that the circuit court had "rebuffed . . . attempt[s] to distinguish between arbitration and

10   forum selection/choice-of-law clauses for enforceability purposes"); *Roby v. Corporation of*

11   *Lloyd's*, 996 F.2d 1353, 1363 n. 2 (2d Cir. 1993) ("Indeed, an arbitration clause is merely a

12   specialized type of forum selection clause").

13       Thus, federal courts routinely construe provisions selecting a specific venue for binding

14   arbitration as more generalized forum-selection clauses.   See *Continental Casualty Co. v.*

15   *American National Insurance Co.*, 417 F.3d 727, 730, 733 (7th Cir. 2005) (upholding dismissal

16   under Rule 12(b)(3) where the designated forum for arbitration was not within the Northern

17   District of Illinois); *Lim v. Offshore Specialty Fabricators, Inc*. 404 F.3d 898, 900–02 (5th Cir.

18   2005) (construing an arbitration clause that required hearings in the Philippines as a forum-

19   selection issue properly raised under Rule 12(b)(3)); *Continental Insurance Co. v. Polish*

20   *Steamship Co.*, 346 F.3d 281, 284 (2d Cir. 2003) (upholding the district court's dismissal of an

21   action based on an arbitration agreement that required hearings in London).

22       The arbitration clauses in the Services Agreement and the Model Release specify that

23   arbitration proceedings are to take place in Miami-Dade County, Florida.[46]   Under the cases cited

24   above, Molloy's argument that these provisions will not support dismissal of this action under

25

26

27       [46]Defs.' Motion, Exh. 1 at 20; Exh. 2 at 31.  The Model Release does allow for the parties

28   to agree to a different venue or the arbitrator to specify a different venue.

1    Rule 12(b)(3) fails.[47]

2        **C.    Application of the Contracts' Arbitration Clauses to Molloy's Present Claims**

3        Having determined that the forum-selection provisions of the arbitration clauses would

4    support dismissal under Rule 12(b)(3), the court must next determine whether the clauses are

5    enforceable under general contract principles and whether Molloy's claims fall within their scope.

6    Only if the answer to both questions is yes can dismissal be properly ordered.  See  *Shainin II,*

7    *LLC v. Allen*, C06-420P, 2006 WL 2473495, *3 (W.D. Wash. Aug. 28, 2006) ("Under the

8    Federal Arbitration Act, the Court's role in determining whether to compel arbitration turns on

9    two questions: '(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the

10   agreement encompasses the dispute at issue,'" quoting *Chiron Corp. v. Ortho Diagnostic*

11   *Systems., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)).

12        **1.    Legal Standards Regarding the Enforcement of  Arbitration Clauses**

13        Molloy makes broad attacks on the validity of the Model Release and Services

14   Agreement,[48] but also challenges the enforceability of the arbitration provisions found in those

15

16   _____

17        [47]Citing *Sizemore v. Able Body Temporary Services*, 981 F.Supp. 1451 (M.D. Ala. 1997),

18   Molloy also contends that the separate venue provision in the Services Agreement concerns only
     enforcement of the arbitration agreement or confirmation of an arbitration award, and cannot be

19   construed as a general forum selection clause.  (Pl.'s Reply at 17–18.)  The *Sizemore* court

20   refused to apply a forum selection clause in an employment agreement to a suit by the employee
     raising statutory discrimination claims.  The court's ruling was based, however, not on a finding

21   that the forum selection clause was limited to certain types of suits, but on a finding that plaintiff's
     discrimination claims under Title VII of the Civil Rights Act of 1964 were "extra-contractual" and

22   did not "arise under" the employment agreement.  *Id.* at 1452–54.  As her citation of *Sizemore*
     suggests, Molloy appears to conflate her argument that the venue provision is limited in scope

23   with a contention that her claims do not arise under the contracts.  The court addresses the latter

24   issue below.  As for Molloy's argument that the general venue provision in the Services
     Agreement is limited to actions to enforce the arbitration provision or confirm an arbitration

25   award, the court need not address it, as it has found that the forum-selection provision in the

26   arbitration clause alone would warrant dismissal of this action under Rule 12(b)(3).

27        [48]Molloy argues, *inter alia*, that she was fraudulently induced to sign the Services
     Agreement because defendants led her to believe that she would not breach the contract by

28   performing specific scenes for Elegant Angel.  (Molloy Decl., ¶ 8.)

contracts.[49]  Both Supreme Court and Ninth Circuit precedent is clear that the court must decide the enforceability of the arbitration provisions; if those provisions are enforceable, it is for the arbitrator to decide the validity of the contracts as a whole.  See *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444–46 (2006); *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1263-64 (9th Cir. 2006) ("When when the crux of the complaint challenges the validity or enforceability of the agreement containing the arbitration provision, then the question of whether the agreement, as a whole, is unconscionable must be referred to the arbitrator.  When the crux of the complaint is not the invalidity of the contract as a whole, but rather the arbitration provision itself, then the federal courts must decide whether the arbitration provision is invalid and unenforceable under 9 U.S.C. § 2 of the FAA" (citations omitted)); *id.* at 1276 ("We do not construe either *Buckeye* or *Prima Paint [Corp. v. Flood & Conklin Mgf. Co.*, 388 U.S. 395 (1967),] to stand for the principle that if plaintiffs challenge an arbitration provision as unenforceable due to unconscionability, they may not include additional contractual or statutory claims in their complaint.  An argument that the arbitration agreement itself is procedurally unconscionable may be informed, as required by California state substantive law, by a determination of whether it is contained within a larger contract of adhesion.  If the district court decides that the arbitration provision is unenforceable, then the remaining claims that address the contract as a whole were never properly arbitrable; a claim such as fraud in the inducement would lie within the jurisdiction of the district court"); *Sussex v. Turnberry/MGM Grand Towers, LLC*, Case No. 2:08-cv-00773-RLH-PAL, 2009 WL 948652, *11 (D. Nev. Apr. 6, 2009) ("Here, the plaintiffs challenge both the enforceability of the PSAs as a whole and the validity of the arbitration provision in the PSAs.  Thus, under controlling Ninth Circuit authority, construing *Buckeye Check Cashing*, 'the particular contractual defenses to enforcement of the arbitration clause at issue' must be decided by the court"); see also *Gay v. CreditInform*, 511 F.3d 369, 387 (3d Cir. 2007) ("Gay argues that both the arbitration provision and the Agreement as a whole are unconscionable. We are limited, however, to addressing the first issue, i.e., whether to enforce the arbitration

---

[49]Pl.'s Opp. at 7–17.

1    provision. The question of whether the Agreement as a whole is unconscionable is a separate issue

2    that, if we find that arbitration of the case would be appropriate, the arbitrator must decide").

3    Consequently, it is appropriate for the court to address Molloy's arguments concerning the

4    enforceability of the arbitration clauses and the venue provisions in them.

5        Because the FAA "does not create any independent federal-question jurisdiction," *Moses*

6    *H. Cone Memorial Hospital*, 460 U.S. at 25 n.32 , federal courts "should apply ordinary state-law

7    principles that govern the formation of contracts" in determining the validity of an agreement to

8    arbitrate. *Ferguson v. Countrywide Credit Indus., Inc.*, 298 F.3d 778, 782 (9th Cir. 2002) (citing

9    *First Options of Chicago*, 514 U.S. at 944). While Molloy has asserted claims based on the

10   federal trademark statutes, her complaint also includes state law claims that fall within the court's

11   supplemental jurisdiction. Where a party seeks to enforce an arbitration clause in an action that

12   asserts both federal and state law claims, the court applies the law of the forum state, including

13   its choice of law rules, to determine the enforceability of the arbitration agreement. See *Douglas*

14   *v. United States District Court*, 495 F.3d 1062, 1067 (9th Cir. 2007) (addressing a motion to

15   compel arbitration in a case asserting both federal and state claims, and stating that "[w]hen a

16   federal court exercises supplemental jurisdiction, 'the federal court applies the choice-of-law rules

17   of the forum state . . . ,'" quoting *Paracor Finance, Inc. v. General Electric Capital Corp.*, 96

18   F.3d 1151, 1164 (9th Cir. 1996)); see generally *Paulsen v. CNF Inc.*, 559 F.3d 1061, 1080 (9th

19   Cir. 2009) ("In a federal question action that involves supplemental jurisdiction over state law

20   claims, [federal courts] apply the choice of law rules of the forum state. . ."); *Bass v. First Pacific*

21   *Networks, Inc.*, 219 F.3d 1052, 1055 n. 2 (9th Cir. 2000) ("[A] federal court exercising

22   supplemental jurisdiction over state law claims is bound to apply the law of the forum state to the

23   same extent as if it were exercising its diversity jurisdiction").

24            **2.      Enforceability of the Arbitration Clause in the Services Agreement**

25                  **a.      Choice of Law Analysis**

26       As California is the forum state, the court applies California law, including its choice of

27   law rules, to evaluate the enforceability of the arbitration agreements in the Model Release and

28   Services Agreement. The Services Agreement includes a choice-of-law provision specifying that

17

1    the contract "shall be construed pursuant to the laws of the State of Florida."[50]  Application of

2    California's choice-of-law rules to this provision involves a three-part analysis:

3       "When an agreement contains a choice of law provision, California courts apply the

4       parties' choice of law unless the analytical approach articulated in § 187(2) of the

5       RESTATEMENT (SECOND) OF CONFLICT OF LAWS . . . dictates a different result.  See

6       *Discover Bank v. Superior Court*, 36 Cal. 4th 148, . . . 113 P.3d 1100, 1117 (Cal.

7       2005).  The California Supreme Court has held that under California's choice of

8       law analysis, a court must [1] determine as a threshold matter 'whether the chosen

9       state has a substantial relationship to the parties or their transaction, or . . . whether

10      there is any other reasonable basis for the parties' choice of law.'  *Nedlloyd Lines*

11      *B.V. v. Superior Court*, 3 Cal. 4th 459, . . . 834 P.2d 1148, 1152 (Cal. 1992).  If

12      either of these tests is satisfied, [2] the second inquiry is whether the 'chosen state's

13      law is contrary to a fundamental policy of California.'  *Id*.  If such a conflict with

14      California law is found, [3] 'the court must then determine whether California has

15      a materially greater interest than the chosen state in the determination of the

16      particular issue.'  *Id*. (internal quotations marks omitted)."  *Hoffman v. Citibank,*

17      *N.A.*, 546 F.3d 1078, 1082 (9th Cir. 2008).

18      A substantial relationship exists with the state chosen by the parties when one of the parties

19   to the contract is incorporated in that state.  See *ABF Capital Corp. v. Osley*, 414 F.3d 1061,

20   1065 (9th Cir. 2005) ("A substantial relationship exists where one of the parties is domiciled or

21   incorporated in the chosen state," citing *Nedlloyd*, 3 Cal.4th at 467).  As both LLL and RK are

22   Florida corporations,[51] the contract has a substantial relationship with Florida and its laws, and

23   there is no need to investigate whether the parties' choice of Florida law was reasonable.  Turning

24   to the second prong of the analysis, there is no clear California public policy that would prohibit

25

26

27      [50]Defs.' Motion, Exh. 2 at 32.

28      [51]Defs.' Motion at 3.

18

1    enforcement of the arbitration provision in the Services Agreement.[52]  Because this is so, the court

2    need not proceed to the third step of the analysis, and can properly find, as a matter of California

3    choice of law, that Florida law governs enforcement of arbitration provision.

4                    **b.    Whether the Arbitration Provision in the Services Agreement is**

5                            **Unconscionable**

6            Molloy argues that the Services Agreement's arbitration clause is unconscionable and

7    should not be enforced as a result.[53]  Arbitration clauses are subject to traditional contract defenses

8    like unconscionability.  See *Powertel, Inc. v. Bexley*, 743 So. 2d 570, 574 (Fla. App. 1999)

9    ("'[G]enerally applicable contract defenses, such as fraud, duress or unconscionability, may be

10   applied to invalidate arbitration agreements without contravening [the Federal Arbitration Act],"

11   quoting *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)).  Under Florida law,

12   Molloy has the burden of establishing that the arbitration provision in the Services Agreement is

13   both "procedurally" and "substantively" unconscionable.  See *Golden v. Mobil Oil Corp.*, 882

14   F.2d 490, 493 (11th Cir. 1989); *Murphy v. Courtesy Ford LLC*, 944 So.2d 1131, 1134 (Fla. App.

15   2006); *Voicestream Wireless Corp. v. U.S. Communications, Inc.*, 912 So.2d 34, 39 (Fla. App.

16   _____

17           [52]As evidence that the arbitration provision in the Services Agreement is substantively

18   unconscionable, Molloy cites the fact that the provision limits her ability to obtain injunctive
     relief, but not LLL's. (Pl.'s Opp. at 9.)  California courts have held, as a matter of public policy,

19   that claims for injunctive relief in actions brought by private attorneys general on the public's
     behalf are not arbitrable.  See *Broughton v. Cigna Healthplans of Cal.*, 21 Cal.4th 1066, 1079-80

20   (1999) (holding that an injunctive relief claim brought by a plaintiff as a private attorney general
     under the Consumer Legal Remedies Acts, California Civil Code § 1750 *et seq.*, was not

21   arbitrable); *Cruz v. PacifiCare Health Systems, Inc.*, 30 Cal.4th 303, 315-16 (2003) (holding that

22   a claim for injunctive relief asserted on behalf of health care consumers under California's Unfair
     Competition Law, California Business and Professions Code § 17200 *et seq.*, was not arbitrable).

23   Florida decisions reflect a similar policy choice.  See *Holt v. O'Brien Imports of Fort Myers, Inc.*,

24   862 So.2d 87, 89 (Fla. App. 2003) (holding that an arbitration agreement in a contract between
     a car dealership and car buyers was unenforceable because an individual consumer could not

25   "waive the protection of a statute . . . designed to protect both the public and the consumer," and

26   thus could not obtain injunctive relief in arbitration under Florida's Deceptive and Unfair Trade
     Practices Act).  Because Molloy does not seek injunctive relief on behalf of the general public,

27   these policies are not relevant in conducting the choice-of-law analysis.

28           [53]Pl. Opp. at 7–10.

2005). "Substantive unconscionability and procedural unconscionability need not exist in equal amounts for the contract to be unenforceable, but there must at least be a modicum of both." *Bhim v. Rent-A-Center, Inc.*, No. 09-21754-CIV, 2009 WL 2970470, *13–14 (S.D. Fla. Sept. 16, 2009) (citing *Voicestream Wireless Corp.* 912 So.2d at 38).

"Procedural unconscionability concerns the manner in which a contract was made and turns on the bargaining power of the parties and their ability to understand the relevant terms." *Sierra v. Isdell*, No. 6:09-cv-124-Orl-19KRS, 2009 WL 2179127, *12 (M.D. Fla. July 21, 2009) (citing *Murphy*, 944 So.2d at 1134). To determine whether an agreement is procedurally unconscionable, "a court must look to the manner in which the contract was entered into and consider factors such as whether the complaining party had a meaningful choice at the time the contract was entered into." *Murphy*, 944 So.2d at 1134. Relevant factors include "'whether the complaining party had a realistic opportunity to bargain regarding the terms of the contract or whether the terms were merely presented on a "take-it-or leave-it" basis; and whether he or she had a reasonable opportunity to understand the terms of the contract.'" *Id.* (citing *Gainesville Health Care Ctr., Inc. v. Weston*, 857 So.2d 278, 284 (Fla. App. 2003)). "In Florida, a party to a contract is not 'permitted to avoid the consequences of a contract freely entered into simply because he or she elected not to read and understand its terms before executing it or because in retrospect, the bargain turns out to be disadvantageous.'" *Murphy*, 944 So.2d at 1134 (quoting *Gainsville*, 857 So.2d at 288).

Molloy contends that LLL had excessive bargaining power because it is a nationwide business while she is not a high school graduate.[54] This argument is unpersuasive. Molloy had been an adult-entertainment performer for more than five years at the time she entered into negotiations with LLL. She was assisted by a business manager and able to solicit his advice concerning the terms of the contract. The negotiations were sufficiently extended, moreover, that

---

[54]Pl.'s Opp. at 8.

20

1  Molloy could have sought legal counsel had she wished to do so.[55]  Further, the fact that LLL paid

2  Molloy "two times the industry standard for an agreement of this type"[56] undermines any

3  suggestion that she lacked bargaining power in the transaction.

4      Molloy asserts that the agreement was presented on a take-it-or-leave-it basis just prior to

5  the time she began filming a scene.[57]  The undisputed evidence, however, shows that discussions

6  between the parties began in late 2006, at least a month before Molloy executed the agreement,[58]

7  and that there were substantive discussions regarding the contract's terms.[59]  Finally, Molloy was

8  paid a $5,000 signing bonus upon entry into the agreement.[60]  The circumstances surrounding

9  negotiation and execution of the agreement, in short, in no manner suggest that it was an adhesion

10  contract that Molloy had no real choice but to accept.[61]  Rather, it appears that LLL expended

11

12  [55]See Spiegler Decl., ¶ 5 (stating that he was involved in the contract discussions with
13  LLL, which began in 2006, at least one month before Molloy signed the agreement).  Mike
    Imber, LLL's President, asserts, in fact, that Molloy told him she had a "lawyer friend" look over
14  the agreement.  (Imber Decl., ¶ 6.)

15  [56]Molloy Decl., ¶ 12.

16  [57]Id., ¶ 7.

17  [58]Id., ¶ 6; Lally Decl., ¶ 2.

18  [59]Molloy contends that she expressed reservations about the exclusivity provision.  (Molloy
19  Decl., ¶ 8.)  LLL contends that all of the contract terms were discussed with Molloy at a dinner
    before the agreement was signed.  (Lally Decl., ¶ 3.)
20
21  [60]Molloy Decl., ¶ 12.

22  [61]At oral argument, Molloy's counsel disputed the court's conclusion that Molloy had the
    opportunity to negotiate the terms of the Services Agreement, citing Molloy's assertions that the
23  contract was presented on "a take-it-or-leave-it basis to sign immediately before [Molloy] was to
24  perform a scene," and that she "was unable to negotiate or modify any of the contract terms."
    (Molloy Decl., ¶ 7)  Counsel correctly noted that as the non-movant, all factual disputes over the
25  formation of the contract must be resolved in Molloy's favor.  See *Murphy*, 362 F.3d at 1138 (in
    evaluating a Rule 12(b)(3) motion, "the trial court must draw all reasonable inferences in favor
26  of the non-moving party and resolve all factual conflicts in favor of the non-moving party").  The
27  factual assertions on which the court relies are contained in Molloy's declaration or in the parties'
    agreement itself, and contradict Molloy's conclusory statements that the contract was presented
28  on a take-it-or-leave-it basis and that she had no opportunity to negotiate.  These assertions are

significant sums to induce Molloy to agree to the terms.

Florida courts have rejected much stronger claims of procedural unconscionability in evaluating other arbitration cases.[62]  See *La Torre v. BFS Retail & Commercial Operations*, LLC,

_____

nothing more than legal conclusions couched in the language of the applicable legal standard. See, e.g., *Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 88-89 (2d Cir. 2006) (holding that the district court did not abuse its discretion in refusing to admit declarations that were "too conclusory to be probative," and citing *Parker v. Reda*, 327 F.3d 211, 215 (2d Cir. 2003) (indicating that the better practice under the Federal Rules of Evidence is to exclude conclusory statements on the ultimate issue); *Hillside Amusement Co. v. Warner Bros. Pictures Distrib. Corp.*, 224 F.2d 629, 630 (2d Cir. 1955) (holding that the district court did not abuse its discretion under the Federal Rules of Evidence by excluding conclusory statements); *Wahad v. Federal Bureau of Investigation*, 179 F.R.D. 429, 435 (S.D.N.Y. 1998) (holding that "[u]ltimate or conclusory facts or conclusions of law [ ] cannot be used on a summary judgment motion"). See also *Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1078 (9th Cir. 2003) (as amended) ("Conclusory allegations unsupported by factual data cannot defeat summary judgment"). "A statement is conclusory where no supporting evidence is offered for a conclusion." *BDO Seidman LLP v. Alliantgroup, L.P.*, Civil Action No. H-08-905, 2009 WL 1322555, *5 (S.D. Tex. May 11, 2009).  Here, not only has Molloy failed to provide facts supporting her conclusions but indeed has adduced evidence that contradicts the assertions.  Molloy states that she was first contacted by LLL in 2006 (Molloy Decl., ¶ 6), well before she actually signed the agreement on January 26, 2007 (Def.'s Motion, Exh. 2 at 26).  Molloy acknowledges that she discussed her reservations about the exclusivity clause with LLL, and secured what she believed to be an accommodation for her future work with Elegant Angel.  (Molloy Decl., ¶ 8).  She also admits that she was represented by an "agent" throughout the discussions (Molloy Decl., ¶ 26), and that she was paid a $5,000 signing bonus and twice the industry rate for work pursuant to the agreement.  (Molloy Decl., ¶ 12).  These are the facts that lead the court to conclude that the Services Agreement is not an adhesion contract; given the contradictions found in Molloy's own declaration, and the lack of any facts supporting her conclusory assertions that she was unable to negotiate the terms of the agreement and that it was presented on a take-if-or-leave-it basis, the court disregards those statements and concludes that there is no factual dispute which must be resolved in Molloy's favor.

[62]In her opposition and at oral argument, Molloy cited *Alexander v. Anthony International, L.P.*, 341 F.3d 256, 266 (3rd Cir. 2003).  There, the Third Circuit concluded that an arbitration clause in an employment contract was procedurally unconscionable because the employees who executed the contract had limited education and were not given a realistic opportunity to negotiate the terms of their employment.  While the general principles that were applied are largely similar to those the court applies here, *Alexander* involved an application of the law of the Virgin Islands, not Florida.  *Id.* at 264.  Further, the case involved a standard form employment contract that all employees were required to sign as a condition of employment without modification.  *Id.* at 266.  Perhaps for this reason, the defendant in that case conceded that it was a contract of adhesion.

1    No. 08-22046-CIV, 2008 WL 5156301, *9–12 (S.D. Fla. Dec. 8, 2008) (rejecting a claim of

2    procedural unconscionability made by a mechanic seeking overtime pay who had limited command

3    of the English language when his employer required him to sign a mandatory arbitration

4    agreement as part of his employment).    Accordingly, Molloy has not met her burden of

5    demonstrating that the agreement was procedurally unconscionable.

6        Some Florida courts apply a sliding scale in evaluating the relative degrees of procedural

7    and substantive unconscionability.  See *Romano v. Manor Care, Inc.*, 861 So. 2d 59, 62 (Fla.

8    App. 2003) ("Essentially a sliding scale is invoked which disregards the regularity of the

9    procedural process of the contract formation, that creates the terms, in proportion to the greater

10   harshness or unreasonableness of the substantive terms themselves," quoting 15 WILLISTON ON

11   CONTRACTS (3d ed. 1972) § 1763A, pp. 226-227).    Others Florida courts, however, do not

12   balance the two. See *Bland v. Health Care & Retirement Corp. of America*, 927 So.2d 252, 257

13   (Fla. App. 2006) ("This court, however, eschews the 'sliding scale' approach.  Rather, we assess

14   procedural unconscionability and substantive unconscionability independently").  Even under the

15   more lenient, sliding scale approach, however, a party challenging a contract must show that there

16   was some degree of procedural unconscionability.  See *Romano*, 861 So.2d at 62 ("'The

17   prevailing view is that [procedural and substantive unconscionability] must both be present in

18   order for a court to exercise its discretion to refuse to enforce a contract or clause under the

19   doctrine of unconscionability,'" quoting *Stirlen v. Supercuts*, 51 Cal.App.4th 1519, 1533 (Cal.

20   App. 1997)).  See also *Bhim v. Rent-A-Center, Inc.*, No. 09-21754-CIV, 2009 WL 2970470,

21   *13–14 (S.D. Fla. Sept. 16, 2009) ("Substantive unconscionability and procedural

22   unconscionability need not exist in equal amounts for the contract to be unenforceable, but there

23   must at least be a modicum of both," citing *Voicestream Wireless Corp.*, 912 So.2d at 38); *Fonte*

24

25   _____

26   *Id.*  As a result, *Alexander* is distinguishable.  Here, the Services Agreement that Molloy signed
     was a unique agreement, drafted specifically to address her performance of services for LLL.
27   There were repeated discussions regarding its content, and its execution was not an absolute
     condition of employment, as evidenced by the fact that Molloy performed scenes for LLL under
28   the Model Release before entering into the Services Agreement.

1   *v. AT&T Wireless Services*, 903 So.2d 1019, 1027 (Fla. App. 2005) ("As we have found a lack

2   of procedural unconscionability, which is necessary before we could decline to enforce a contract

3   as unconscionable, we need not address substantive unconscionability").  Since Molloy has not

4   demonstrated that the contract is procedurally unconscionable, the court need not address

5   substantive unconscionability.[63]  Rather, it concludes that the Services Agreement is enforceable.

6                       **c.    Whether Molloy's Claims Are Encompassed by the Services**

7                              **Agreement**

8           Having concluded that the arbitration provision in the Services Agreement is enforceable,

9   and that it operates effectively as a forum-selection clause, Molloy will have to bring her claims

10  in the forum designated in the arbitration clause if they fall within the provision's scope.[64]  See

11  *Shainin II, LLC*, 2006 WL 2473495 at *3.  "If the applicability of a forum selection clause [to

12  non-contractual claims] is unclear, Ninth Circuit courts consider whether 'the claims alleged in

13  the complaint relate to the interpretation of the contract.'"  *Hebe v. Seagrave Fire Apparatus,*

14  *LLC*, CV 07-155 AS, 2007 WL 1541741, *3 (D. Or. May 18, 2007) (citing *Graham Technology*

15  *Solutions, Inc. v. Thinking Pictures, Inc.*, 949 F.Supp. 1427, 1433-34 (N.D. Cal. 1997)).

16          In *Graham Technology Solutions, Inc.*, 949 F.Supp. 1427 (N.D. Cal. 1997), a computer

17  programmer executed a Professional Services Agreement ("PSA"), which contained a forum

18

---

19          [63]Molloy's failure to show procedural unconscionability defeats her unenforceability
20  argument.  The court notes, however, that certain aspects of the arbitration clause in the Services
    Agreement limit Molloy's remedies in arbitration but do not limit LLL's.  (See Defs.' Motion,
21  Exh. 2 at 31-32.)  Florida courts have concluded that such provisions are substantively
22  unconscionable.  *Murphy*, 944 So.2d at 1134 (it is substantively unconscionable to "limit available
    remedies, exclude punitive damages, prevent equitable relief, impose substantial costs, or lack
23  mutuality of obligation with respect to the arbitration of disputes"); *id.* (noting that an agreement
24  will be deemed to be substantively unconscionable only if the terms are "'so outrageously unfair
    as to shock the judicial conscience,"' quoting *Bland ex. rel. Coker v. Health Care & Retirement*
25  *Corp. of Am.*, 927 So.2d 252, 256 (Fla. App. 2006)).  Despite this fact, under Florida law, there
26  must be some procedural unconscionability before the court can declare the agreement
    unenforceable.

27          [64]Defs.' Motion at 2.  Molloy makes no assertion that her claims are not within the scope
28  of the Model Release.

selection clause requiring that all disputes be heard in New York. *Id.* at 1429. Plaintiff filed suit against defendant in California, alleging copyright infringement, unfair competition and false advertising. When defendant sought to enforce the forum selection clause, plaintiff asserted that its complaint did not raise contractual issues related to the professional services agreement, and that what was "truly at stake . . . [was] the vindication of its rights under the Copyright Act, not the interpretation of a contract." *Id.* at 1431.

To determine whether the forum selection clause covered the copyright claims, the court looked to *Manetti-Farrow, Inc. v. Gucci America, Inc.*, 858 F.2d 509 (9th Cir. 1988), and a Seventh Circuit decision adopting *Manetti-Farrow*'s approach for trademark claims, *Omron Healthcare, Inc. v. Maclaren Exports, Ltd.*, 28 F.3d 600 (7th Cir. 1994). The court noted that in *Omron*, the Seventh Circuit

> "considered whether the plaintiff's trademark infringement claim was subject to a forum selection clause which provided that all disputes arising out of a distribution agreement would be litigated in the High Court of Justice in England. Omron argued that its suit arose out of trademark infringement, not out of contract, and was therefore not subject to the forum selection clause. The *Omron* court rejected that argument on the basis that 'all disputes the resolution of which arguably depend on the construction of an agreement "arise out of" that agreement' for purposes of a forum selection clause. *Omron*, 28 F.3d at 602. The court further found that resolution of the Omron-Maclaren dispute depended upon an understanding of the written distribution agreement between the parties and its implied terms, that Omron's claim of trademark infringement was subject to the forum selection clause, and that Omron's claims had to be litigated in England." *Id.* (citing *Omron*, 28 F.3d at 601, 604).

Applying the Seventh Circuit's reasoning, the *Graham Technology Solutions* court found that "[a]lthough the causes of action pleaded . . . by [plaintiff] [were] copyright infringement claims, [their] resolution . . . ultimately require[d] interpretation of the PSA." *Id.* at 1433. Plaintiff's complaint alleged, *inter alia*, that defendant had illegally made and distributed copies of a

computer program plaintiff had developed, and falsely represented that it developed and owned the program. *Id.* The court found there was "no question that [plaintiff's] claims relate[d] to the rights and duties enumerated in the PSA," because, for example, the PSA assigned to defendant ownership of all copyrights to software developed in connection with the project on which plaintiff had worked. *Id.* It noted that "[t]he central issue in th[e] case" was whether the capabilities unique to plaintiff's computer program were included within the project specifications provided by defendant to plaintiff, such that the program was developed by plaintiff under the terms of the PSA. *Id.* Consequently, it enforced the contract's forum selection clause. *Id.*

Molloy's complaint alleges, *inter alia*, that her trademarked stage name and image were displayed in defendants' advertising and on websites owned and controlled by RK and LLL. She also asserts that RK and LLL distributed the Mark and her image to other defendants. Molloy contends that these actions infringed her rights in the Mark and misappropriated her name and image. The Services Agreement signed by Molloy states, however, that "although [Molloy] will retain the ownership right over the stage name "Flower Tucci" after the expiration of this Agreement, [LLL]'s rights hereunder shall include the right to continue to use such stage name in connection with the display, sale, promotion, republication, and licensing of the Content. . . . [Molloy] acknowledges that , ancillary to this Agreement, [LLL] has undertaken to purchase, for [LLL]'s exclusive use and ownership, the domain name www.flowertucci.com ("the Site") from a third party. . . . [LLL] shall be the sole and exclusive owner of the Site and [LLL], or [LLL]'s assigns, will have the continuing right to promote [Molloy]'s services performed hereunder on the Site."[65]

Determining the extent of the rights Molloy granted to LLL in the Services Agreement will clearly impact her trademark infringement, unfair competition and misappropriation claims. Molloy granted LLL significant rights to use the Mark in the contract, and additionally acknowledged LLL's interest in promoting www.flowertucci.com. Applying the analysis set forth in *Omron* and *Graham Technology Solutions*, the court concludes that Molloy's claims against

[65]Defs.' Motion, Exh. 2 at 29.

1  LLL and RK relate to and will require construction of the Services Agreement.  They thus fall

2  within the ambit of the forum selection clause.

3        **2.    Enforceability of the Arbitration Clause in the Model Release**

4          **a.    Choice of Law**

5        Unlike the Services Agreement, the Model Release does not contain a choice of law

6  provision.[66]  Thus, the court applies California law to determine whether the arbitration provision

7  in the release is enforceable.  See *Bass v. First Pacific Networks, Inc.*, 219 F.3d 1052, 1055 n.

8  2 (9th Cir. 2000) ("[A] federal court exercising supplemental jurisdiction over state law claims

9  is bound to apply the law of the forum state to the same extent as if it were exercising its diversity

10  jurisdiction").

11        **b.    Whether the Arbitration Provision in the Model Release is**

12            **Enforceable**

13        Molloy does not argue that the Model Release is unconscionable or otherwise

14  unenforceable.[67]  Thus, the court considers only whether the arbitration provision in the release

15  is generally enforceable under California law and whether Molloy's claims fall within its ambit.

16  See *Shainin II, LLC*, 2006 WL 2473495 at *3.  "[A]n arbitration agreement may not function so

17  as to require [a party] to waive potential recovery for substantive statutory rights in an arbitral

18  forum."  *Davis v. O'Melveny & Meyers*, 485 F.3d 1066, 1082 (9th Cir. 2007) (citing *Gilmer v.*

19  *Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28 (1991), and *Armendariz v. Foundation Health*

20  *Psychcare Services, Inc.*, 24 Cal.4th 83, 99-100 (2000)).  See also *Arreguin v. Global Equity*

21  *Lending, Inc.*, No. C 07-06026 MHP, 2008 WL 4104340, *6 (N.D. Cal. Sept. 2, 2008)

22  ("[P]arties that agree to arbitrate statutory claims still are entitled to basic procedural and remedial

23

24        [66]In his declaration, Jose Tavarez states that disputes under the Model Release must be
25  resolved under Florida law.  (Declaration of Jose Tavarez ("Tavarez Decl."), ¶ 3.)  The Model
26  Release contains no such provision, however.

27        [67]Molloy focuses her arguments regarding unconscionability solely on the Services
   Agreement, perhaps because she is under the impression that defendants rely solely on that
28  agreement in seeking dismissal.  (Pl's. Opp. at 7.)

1   protections so that they can effectively realize their statutory rights," quoting *Ting v. AT & T*,

2   319 F.3d 1126, 1151 (9th Cir. 2003)).

3       To be enforceable under California law, therefore, an agreement to arbitrate statutory

4   claims must meet the minimum requirements first articulated in *Cole v. Burns Intern. Sec.*

5   *Services*, 105 F.3d 1465, 1482 (D.C. Cir. 1997). Specifically, the agreement must "(1) provide[ ]

6   for neutral arbitrators, (2) provide[ ] for more than minimal discovery, (3) require[ ] a written

7   award, (4) provide[ ] for all of the types of relief that would otherwise be available in court, and

8   (5) [ ] not require employees to pay either unreasonable costs or any arbitrators' fees or expenses

9   as a condition of access to the arbitration forum." *Id.*(applying *Gilmer*, 500 U.S. at 28); see also

10  *Arreguin*, 2008 WL 4104340 at *6 (listing the *Cole* factors, noting that "[b]oth the Ninth Circuit

11  and the California Supreme Court have cited . . . this portion of *Cole* with approval," and citing

12  *Ting*, 319 F.3d at 1151, and *Armendariz*, 24 Cal.4th at 102 (noting that the *Cole* factors are

13  minimum requirements for court enforcement of an agreement to arbitrate)).

14      The Model Release does not restrict the forms of relief available to the prevailing party

15  in an arbitration. Additionally, Molloy does not argue that an arbitration proceeding under the

16  Model Release would not involve neutral arbitrators, provide for more than minimal discovery,

17  or require a written award.[68] Molloy does contend, however, that an arbitration in Florida would

18  impose burdensome costs on her that would limit her ability to recover,[69] and that a "loser pays"

19  provision would make arbitration "prohibitively expensive."[70] The fee shifting provision in the

20

---

21  [68]Because the arbitration clause in the Model Release provides that all claims will be
    governed by the "Employment Dispute Resolution Rules of the American Arbitration
22  Association," it is clear these requirements are met. (See American Arbitration Association
    National Rules for the Resolution of Employment Disputes, Rule 12 (providing for neutral
23  arbiitrators), Rule 9 (granting the arbitrator broad discretion to order discovery), and Rule 39
24  (requiring a written award) (Jan. 1, 1999).)

25  [69]Pl.'s Opp. at 13. Molloy offers several estimates of the cost of arbitration. While her
    estimates may be accurate, the court's focus for purposes of the fifth *Cole* factor is the specific
26  provisions of the release affecting the cost of arbitration.

27  [70]*Id.* at 9. Molloy makes this argument with respect to the Services Agreement, but the
28  duty of the losing party to pay arbitration and attorneys' fees in the Model Release is identical,

1  Model Release states: "Attorneys' fees and the fees of the arbitrator shall be paid by the losing

2  party, as identified by the arbitrator."[71]

3        The Supreme Court has held that a party seeking to block enforcement of an arbitration

4  clause on the basis of burdensome fees must first show a likelihood that she will be required to

5  bear the costs.  *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 92 (2000)

6  ("[W]e believe that where, as here, a party seeks to invalidate an arbitration agreement on the

7  ground that arbitration would be prohibitively expensive, that party bears the burden of showing

8  the likelihood of incurring such costs").  Applying *Green Tree*, many courts interpreting "loser

9  pays" provisions in arbitration contracts have held that the potential costs associated with losing

10  the arbitration are too speculative to block enforcement.  See *Musnick v. King Motor Co.*, 325

11  F.3d 1255, 1259 (11th Cir. 2003) (In . . . the overwhelming consensus among the Circuits, it is

12  clear that the district court erred in holding that Musnick cannot be compelled to arbitrate because

13  the 'loser pays' provision of the Agreement denies him his statutory rights under Title VII.  After

14  *Green Tree*, an arbitration agreement is not unenforceable merely because it may involve some

15  'fee-shifting.'  The party seeking to avoid arbitration under such an agreement has the burden of

16  establishing that enforcement of the agreement would 'preclude' him from 'effectively vindicating

17  [his] federal statutory right in the arbitral forum,'" quoting *Green Tree*, 531 U.S. at 90);

18  *Goodman v. ESPE America, Inc.*, No. 00-CV-862, 2001 WL 64749, *3–4 (E.D. Pa. Jan. 19,

19  2001) ("[T]he arbitration agreement in this case neither requires up-front payment of costs before

20  commencing an action nor mandates the splitting of costs after conclusion of the case.  Indeed,

21  not only is the arbitration provision silent as to any initial costs and filing fees, the provision by

22  its terms suggests that Plaintiff is not liable for any costs at any time if his claim is successful.

23  While the potential of having to pay costs and attorney's fees if unsuccessful may deter some

24  plaintiffs from bringing marginal cases, it is far less a deterrence than ordinary fee-splitting

25  arrangements or the large initial deposits involved in other cases").

27  and the court thus considers the issue in evaluating the enforceability of the release.

28  [71]Defs.' Motion, Exh. 1 at 20.

1    Although Molloy argues that the costs associated with arbitration would deprive her of an

2    opportunity to pursue her claim, *Green Tree* and its progeny teach that the possibility that Molloy

3    will be required to bear the costs of arbitration is speculative, as the "loser pays" provision in the

4    Model Release's arbitration provision will shift arbitration and attorneys' fees to LLL if Molloy

5    is successful.  Consequently, the court concludes that the potential cost of arbitration does not act

6    as a barrier to Molloy's ability to prosecute her claims in an arbitral forum, and that the Model

7    Release is enforceable under California law as a result.

8              **c.    Whether Molloy's Claims Are Encompassed by to the Model**

9                       **Release**

10   Having concluded that the arbitration provision in the Model Release is enforceable, the

11   court must next examine whether it encompasses claims such as those Molloy asserts in this case.

12   Section 5(a) of the Model Release states: "[Molloy] further grants to Producer the perpetual but

13   nonexclusive right to use, and to license to others to use, [Molloy]'s name and biography and

14   reproductions of [Molloy]'s physical likeness and/or voice for the purpose of advertising and

15   exploiting an[y] work embodying the Performance and/or Audio Portion; and the use of any of

16   the rights herein granted for commercial advertising or publicity (including endorsements) in

17   connection with any product, commodity or service manufactured, distributed or offered by

18   Producer."[72]  Section 5(c) provides: "In connection with the marketing of the Project, [Molloy]

19   grants Producer the right to use Model's stage name, and any other names that Model has used

20   in the past or may use in the future, including those which may be trademarked."[73]

21   It does not appear, from the complaint and the parties' briefs on these motions, that the

22   specific performance covered by the Model Release is at issue in this case.  Given the potentially

23   broad language of the rights conveyed to LLL under the release, however, it is possible that they

24   will affect the validity of her trademark infringement and unfair competition claims against LLL.

25   In the first clause of Section 5(a), Molloy granted LLL the perpetual right to use her name and

26   _____

27   [72]*Id.* at 21.

28   [73]*Id.*

30

physical likeness; "for the purpose of" advertising or promoting a work embodying the single performance covered by the Model Release. Similarly, in Section 5(c), Molloy grants LLL the right to use her stage name, including trademarked stage names, "in connection with the marketing of the Project." The second clause of Section 5(a), however, appears to be broader, granting LLL the right to use Molloy's name and physical likeness to advertise "any product, commodity or service manufactured, distributed or offered by [LLL]." Arguably, therefore, it affects LLL's right to use Molloy's name and image, and affects her ability to pursue the trademark, unfair competition and misaprropriation claims she has asserted in this action. Because, at a minimum, this issue will need to be litigated and decided, under *Omron* and *Graham Technology Solutions*, Molloy's claims against LLL relate to and will require construction of the Model Release. They thus fall within the ambit of the forum selection clause.

> **D.    Whether the Court Should Enforce the Forum Selection Clauses in the Arbitration Provisions of the Services Agreement and Model Release**

Molloy next argues that the court should not enforce the forum selection clauses in the arbitration provisions of the Services Agreement and Model Release.[74]  "Federal law governs the validity of a forum selection clause." *Argueta*, 87 F.3d at 324 (citing *Manetti-Farrow*, 858 F.2d at 513).

> "[F]orum selection clauses are prima facie valid and should not be set aside unless the party challenging enforcement of such a provision can show it is '"unreasonable" under the circumstances.' [*The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972)].   The Supreme Court has construed this exception narrowly.  A forum selection clause is unreasonable if (1) its incorporation into the contract was the result of fraud, undue influence, or overweening bargaining power, *Carnival Cruise Lines [v. Shute]*, 499 U.S. [585,] 591 [(1991)]; *Bremen*, 407 U.S. at 12-13 . . . ; (2) the selected forum is so 'gravely difficult and

---

[74]Although Molloy focuses her arguments solely on the Services Agreement, the court considers the enforceability of the forum selection clauses in both contracts.

1  inconvenient' that the complaining party will 'for all practical purposes be deprived

2  of its day in court,' *Bremen*, 407 U.S. at 18 . . . ; or (3) enforcement of the clause

3  would contravene a strong public policy of the forum in which the suit is brought.

4  *Id.* at 15. . . .  To establish the unreasonableness of a forum selection clause,

5  Appellants have the 'heavy burden of showing that trial in the chosen forum would

6  be so difficult and inconvenient that the party would effectively be denied a

7  meaningful day in court.'  *Pelleport [Investors, Inc. v. Budco Quality Theatres,*

8  *Inc.]*, 741 F.2d [273,] 281 [(9th Cir. 1984)] (citing *Bremen*, 407 U.S. at 18)."

9  *Argueta,* 87 F.3d at 325.

10   Molloy thus bears the "heavy burden" of demonstrating that the forum selection clauses,

11  which are "prima facie valid," should *not* be enforced.  See, e.g., *Carnival Cruise Lines*, 499

12  U.S. at 594 ("because respondents do not claim lack of notice of the forum clause, we conclude

13  that they have not satisfied the 'heavy burden of proof,' required to set aside the clause on

14  grounds of inconvenience" (internal citation omitted)); *Bremen*, 407 U.S. at 15 ("we conclude that

15  the forum clause should control absent a strong showing that it should be set aside").

16         **1.    Fraud, Undue Influence, or Overweening Bargaining Power**

17        Molloy first contends that the forum selection clause in the Services Agreement's

18  arbitration provision is unenforceable because her execution of that contract was the product of

19  fraud or undue influence.  "[S]imply alleging that one was duped into signing the contract is not

20  enough." *Richards v. Lloyd's of London*, 135 F.3d 1289, 1297 (9th Cir. 1998) (en banc) ("For

21  a party to escape a forum selection clause on the grounds of fraud, it must show that *'the inclusion*

22  *of that clause in the contract* was the product of fraud or coercion,'" citing *Scherk*, 417 U.S. at

23  519 n. 14 (emphasis original)).  Thus, Molloy must adduce evidence tending to show that LLL

24  or its agents "fraudulently inserted the clause[ ] without [her] knowledge," or that LLL "misled

25  [her] as to the legal effect" of the forum selection provision within the arbitration clause.  *Id.*

26        Molloy does not allege that inclusion of the arbitration clauses or venue provisions in the

27  two contracts was the product of fraud or coercion.  There is no allegation that the arbitration or

28  venue provisions were inserted without her knowledge or that LLL or its agents misled her as to

the legal effect of the provisions.  Molloy alleges instead that she was fraudulently induced to enter into the Services Agreement based on statements by LLL that her work with Elegant Angel would not be deemed a breach.[75]  This argument relates solely to the exclusivity provision in the agreement, however, not the arbitration clause or venue provision.  Moreover, to the extent it applies more broadly, it concerns the contract as a whole, and is thus an issue for an arbitrator to decide, not the court.  See *Buckeye Check Cashing*, 546 U.S. at 444–46; *Nagrampa*, 469 F.3d at 1263-64.

Parties are presumed to read the contracts they sign.  *Bonny v. Society of Lloyd's*, 3 F.3d 156, 160 (7th Cir. 1993) (enforcing a forum selection clause, and noting that "a party to a contract has an obligation to read its provisions.  It is a fundamental principle of contract law that a person who signs a contract is presumed to know its terms and consents to be bound by them").  Anyone reviewing the Services Agreement or Model Release would readily see the arbitration/forum selection provisions, and be able to understand their clear language.

Molloy similarly adduces little evidence that inclusion of the arbitration/forum selection provisions in either contract was the result of "overreaching" or "overweening bargaining power."  While she argues generally that LLL is a large corporation and she is an actress who did not graduate from high school,[76] the suggested difference in business sophistication is insufficient, standing alone, to invalidate the venue provisions in the arbitration clauses.  In *Murphy*, for example, the Ninth Circuit held that a forum selection clause in an employment contract was not the result of "overreaching" despite the fact that the employee seeking to set aside the contract had a tenth grade education and was told that he would have to sign an employment contract with a forum selection clause to be hired.  *Murphy*, 362 F.3d at 1141.  The Ninth Circuit flatly rejected the employee's claim of overreaching, noting that "[u]nder *Carnival Cruise*, a differential in power or education on a non-negotiated contract will not vitiate a forum selection clause."  *Id*. The court continued:

---

[75]Pl.'s Opp. at 11.

[76]*Id*. at 9.

"[T]here is no evidence of overreaching beyond Murphy's assertion: Murphy signed a new contract with a similar forum selection clause each year from 1992 to at least 1996. If, as Murphy asserts, Schneider told him that the contract was not negotiable, Murphy had the opportunity to seek work with other employers if he opposed the forum selection clause. Murphy's assertions reduce to a claim of power differential and non-negotiability. This evidence, even accepted as true for purposes of the Rule 12(b)(3) motion, is not enough to overcome the strong presumption in favor of enforcing forum selection clauses." *Id.*

See also *Carnival Cruise Lines*, 499 U.S. at 1526 (holding that a forum selection clause in a non-negotiable form contract, which required Washington residents to litigate tort claims arising from a cruise off the west coast of Mexico in Florida, was not the result of overreaching); *Spradlin v. Lear Siegler Management Services Co., Inc.*, 926 F.2d 865, 868 (9th Cir. 1991) (upholding an employment agreement requiring an employee to litigate claims against his U.S. employer in Saudi Arabia). Molloy, moreover, had a manager to assist her in making business and contract decisions,[77] and was admittedly able to negotiate an above-market salary in the Services Agreement.[78] Given these facts and the high burden of proof that must be met to demonstrate that a forum selection clause is the product of overreaching, the court concludes that Molloy has not shown that there is a basis for refusing to enforce the forum selection clauses.

### 2. Grave Difficulty or Inconvenience

Molloy next asserts that the court should set aside the forum-selection provisions because the burden of litigating her dispute with LLL and RK in Florida will deny her a "meaningful day in court."[79] To succeed on this argument, Molloy must once again meet a heavy burden. She must show that "the selected forum is so 'gravely difficult and inconvenient' that the complaining

---

[77]Spiegler Decl., ¶ 1.

[78]Pl.'s Opp. at 4. Molloy states that she was promised a salary that was twice the industry standard for work performed pursuant to the Services Agreement.

[79]*Id.* at 13–14.

party will 'for all practical purposes be deprived of its day in court.'" *Argueta*, 87 F.3d at 325 (citing and quoting *Bremen*, 407 U.S. at 18); see also *Murphy*, 362 F.3d at 1143 (same).  Molloy first contends that her manager is unwilling to travel to Florida to testify on her behalf.[80]  His testimony can easily be preserved by taking a videotaped deposition in Los Angeles, however, or by requesting that the court or arbitrator allow him to give live testimony via video teleconference.  Molloy also details the expenses she would incur to travel Florida for an arbitration.[81]  The court is not persuaded, however, that the costs involved in litigating in Florida would be so onerous that they would deny Molloy the opportunity to pursue her claims.

### 3.    Conclusion Regarding Enforceability of the Forum Selection Clauses in the Services Agreement and Model Release

Because Molloy's arguments regarding the unenforceability of the arbitration/forum selection clauses in the Services Agreement and Model Release are unavailing, the court concludes that the provisions are enforceable and require that Molloy bring her claims against LLL and RK in Florida.

### E.    Legal Standard Governing Motions to Transfer Venue Under 28 U.S.C. § 1404

Although the court has determined that the forum selection provisions in the contracts' arbitration clauses require Molloy to bring her claims in Florida, the court addresses defendants' motion to transfer the action to the Southern District of Florida under 28 U.S.C. § 1404(a) as a further and alternative basis for its decision.

Section 1404(a) permits a court to transfer an action "[f]or the convenience of parties and witnesses," and  "in the interest of justice," so long as the action could have been filed in the transferee district in the first instance.  28 U.S.C. § 1404(a).  See also *Sparling v. Hoffman Constr. Co.*, 864 F.2d 635, 639 (9th Cir. 1988) (the district court has broad discretion to transfer a case to another district where venue is also proper); *Commodity Futures Trading Comm. v. Savage*, 611 F.2d 270, 279 (9th Cir. 1979) ("Weighing of factors for and against transfer involves

---

[80]Spiegler Decl., ¶ 10.

[81]Pl.'s Opp. at 13–14.

subtle considerations and is best left to the discretion of the trial judge"); *E. & J. Gallo Winery v. F. & P.S.p.A.*, 899 F.Supp. 465, 466 (E.D. Cal. 1994) (noting that whether to transfer venue is within "the inherently broad discretion of the Court"); see also 15 Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, FEDERAL PRACTICE AND PROCEDURE § 3847 (2007). The district court must "'adjudicate motions for transfer [of venue] according to an 'individualized, case-by-case consideration of convenience and fairness.'" *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000) (quoting *Stewart Org. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988)).

In deciding a motion to transfer venue, the court must weigh multiple factors, including (1) the plaintiff's choice of forum; (2) the convenience of the parties; (3) the convenience of the witnesses; (4)the location of books and records; (5) which forum's law applies; (6) the interests of justice; and (7) administrative considerations. Wright et al., *supra*, §§ 3841-55; see also *Jones*, 211 F.3d at 498-99 (suggesting that the following factors may be relevant in assessing a motion to transfer venue: "(1) the location where the relevant agreements were negotiated and executed, (2) the state that is most familiar with the governing law, (3) the plaintiff's choice of forum, (4) the respective parties' contacts with the forum, (5) the contacts relating to the plaintiff's cause of action in the chosen forum, (6) the differences in the costs of litigation in the two forums, (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses, and (8) the ease of access to sources of proof"); *Florens Container v. Cho Yang Shipping*, 245 F.Supp.2d 1086, 1088 (N.D. Cal. 2002) ("In considering motions to transfer venue under this section, courts look to: (1) the convenience of the parties; (2) the convenience of the witnesses; and (3) the interests of justice," citing *Kasey v. Molybdenum Corp.*, 408 F.2d 16, 20 (9th Cir. 1969)).

The burden is on the moving party to establish that a transfer will allow a case to proceed more conveniently and better serve the interests of justice. See, e.g., *Commodity Futures Trading Comm.*, 611 F.2d at 279; *STX, Inc. v. Trik Stik, Inc.*, 708 F.Supp. 1551, 1555-56 (N.D. Cal. 1988) ("In seeking to transfer a case to a different district, a defendant bears a heavy burden of proof to justify the necessity of the transfer. The plaintiff's choice of forum should not be easily overturned"). Indeed, it "is clear that the burden is on the defendant seeking transfer under Section 1404(a) to establish why there should be a change of forum. . . . Without more, it is not

enough that the defendant would prefer another forum, nor is it enough merely to show that the claim arose elsewhere.  And, not surprisingly, transfer will not be ordered if the result is merely to shift the inconvenience of where the action is located from one party to another . . . ."  Wright et al., *supra*, § 3848 (footnotes omitted).

## 1.    Plaintiff's Choice of Forum

Despite the broad discretion afforded the district court in determining whether to transfer venue, a plaintiff's choice of venue is generally accorded deference.  See, e.g., *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947) ("It is often said that the plaintiff may not, by choice of an inconvenient forum, 'vex,' 'harass,' or 'oppress' the defendant by inflicting upon him expense or trouble not necessary to his own right to pursue his remedy.  But unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed"); *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 842 (9th Cir. 1986) ("The defendant must make a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum"); *Florens Container*, 245 F.Supp.2d at 1092 ("[U]nder Ninth Circuit law, a plaintiff's choice of forum is accorded substantial weight in proceedings under this section, and courts generally will not transfer an action unless the 'convenience' and 'justice' factors strongly favor venue elsewhere," citing *Securities Investor Protection Corp. v. Vigman*, 764 F.2d 1309, 1317 (9th Cir. 1985)); *DIRECTV, Inc. v. EQ Stuff, Inc.*, 207 F.Supp.2d 1077, 1082 (C.D. Cal. 2002) ("There is a strong presumption in favor of the plaintiff's choice of forum," citing *Ravelo Monegro v. Rosa*, 211 F.3d 509, 513 (9th Cir. 2000)); *E. & J. Gallo Winery*, 899 F.Supp. at 466 (as a general principle, "plaintiff's choice of forum should rarely be disturbed").

Molloy is a California resident,[82] and has chosen to file suit in the Central District of California.  She alleges that the execution and performance of the contracts at issue also took place in the district.  Generally, the fact that a plaintiff has filed suit in the district where she resides is a sufficient connection to accord her choice of forum deference.  See, e.g., *GTE Wireless, Inc. v. Qualcomm, Inc.*, 71 F.Supp.2d 517, 519 (E.D. Va. 1999) ("[P]laintiff's choice of its home

---

[82]*Id.* at 21.

1   forum is given more weight than its choice of a foreign forum"); see also *Bailey v. Union Pac.*

2   *R.R. Co.*, 364 F.Supp.2d 1227, 1230 (D. Colo. 2005) (a plaintiff's choice of forum is entitled to

3   little weight where "[i]t is neither his home nor the place of the accident"); *Orb Factory, Ltd. v.*

4   *Design Science Toys, Ltd.*, 6 F.Supp.2d 203, 210 (S.D.N.Y. 1998) ("[T]he plaintiff's choice is

5   generally accorded more deference where there is a material connection or significant contact

6   between the forum state and the . . . events allegedly underlying the claim, . . . or where the

7   plaintiff is a resident of the forum district").  Consequently, this factor weighs against transfer to

8   the Southern District of Florida.  The court notes, however, that the importance of the factor is

9   undercut by plaintiff's execution of contracts that require her to resolve disputes with defendants

10  in Florida.

11                    **2.    The Convenience of the Parties**

12          RK and LLL are corporations domiciled in Florida,[83] as are defendants Scorching Sands,

13  Inc. and Net 227, Inc.[84]  Defendant Eddie Collins is a resident of Los Angeles, defendants Adam

14  Nalepowski and Michael Puskarz are residents of Poland, and defendant T. Kgels is a resident of

15  the Netherlands.[85]  While Molloy alleges that all of the defendants have regular contacts with

16  California,[86] four are companies incorporated in Florida.  Further, RK and LLL argue that they

17  include forum selection clauses in contracts they negotiate to avoid the burdens of litigating in

18  distant venues.[87]  See *Jones*, 211 F.3d at 497 ("[T]he presence of a forum selection clause is a

19  significant factor in the court's § 1404(a) analysis").

20          Molloy argues that she has limited income and would be financially burdened if the case

21

22

23  ────────────

24  [83]Defs.' Motion at 11.

25  [84]Complaint, ¶¶ 7, 11.

26  [85]*Id.* at 4–6.  Defendant Namecheap, Inc. was voluntarily dismissed on July 14, 2009.

27  [86]Complaint, ¶¶ 5–16.

28  [87]Defs.' Motion at 11.

were transferred to Florida.[88]  See *Hernandez v. Graebel Van Lines*, 761 F.Supp. 983, 989 (E.D.N.Y. 1991) ("[W]here a disparity between the parties exists, such as an individual plaintiff suing a large corporation, the court may also consider the relative means of the parties in determining whether to transfer"); see also *Tensor Group, Inc. v. All Press Parts & Equipment, Inc.*, 966 F.Supp. 727, 728-29 (N.D. Ill. 1997) (concluding that the convenience of the parties weighed in favor of transferring a copyright infringement action from the Northern District of Illinois to the Eastern District of Wisconsin, because the plaintiff copyright holder was a large corporation that would not be burdened by litigating in Wisconsin, while the alleged infringer was a "one-man operation" that would face a great burden if forced to litigate in Illinois).

By contrast, four defendants are Florida citizens, and Florida would be a more convenient forum for three other defendants who are citizens of Delaware, Poland and the Netherlands. Nonetheless, because it would be a burden for plaintiff to litigate in that jurisdiction, however, this factor would generally be neutral. Given the fact that both contracts plaintiff executed contained forum selection provisions requiring that disputes be resolved in Florida, however, the court finds that the factor favors transfer.  See *Curwood Inc. v. Prodo-Pak Corp.*, No. 07-C-544, 2008 WL 644884, *5 (E.D. Wis. Mar. 7, 2008) ("[A] party who enters into a contract containing a forum selection clause may not avoid the effect of the clause by arguing his own inconvenience. . . . Thus, the fact that Curwood would find a Wisconsin forum more convenient is irrelevant"); *Youngblood v. JTH Tax Services, Inc.*, Civil Action No. SA: 06-CA-380-XR, 2006 WL 1984656, *5 (W.D. Tex. July 17, 2006) (noting that the fact that a plaintiff had signed a contract including a forum selection clause was "an indication that the parties believed Virginia to be the most appropriate and convenient forum," and granting a motion to transfer under § 1404(a) as a result).

### 3.    The Convenience of the Witnesses

The convenience of witnesses is often the most important factor in determining whether a transfer under § 1404 is appropriate.  See, e.g., *Denver & Rio Grande Western Ry. Co. v. Brotherhood of Railroad Trainmen*, 387 U.S. 556, 560 (1967) ("[V]enue is primarily a matter of

---

[88]Pl.'s Opp. at 22.

1   convenience of litigants and witnesses"); *A.J. Industries v. U.S. District Court*, 503 F.2d 384,

2   386-87 (9th Cir. 1974) (discussing the importance and history of the convenience of witnesses in

3   evaluating a § 1404 transfer); *Decter v. MOG Sales, LLC*, No. CV 06-1738 MCE GGH, 2006

4   WL 3703368, *2 (E.D. Cal. Dec. 14, 2006) ("The convenience of the witnesses is said to be the

5   most important factor in considering a transfer motion," citing *Los Angeles Memorial Coliseum*

6   *Comm'n v. Nat'l Football League*, 89 F.R.D. 497, 501 (C.D. Cal. 1981)); *Applied Elastomerics,*

7   *Inc. v. Z-Man Fishing Products, Inc.*, No. C 06-2469 CW, 2006 WL 2868971, *4 (N.D. Cal.

8   Oct. 6, 2006) (same).

9          The court accords less weight to the inconvenience of *party* witnesses, however, as they

10  can be compelled to testify regardless of the forum in which the lawsuit is ultimately litigated.

11  See, e.g., *Applied Elastomerics, Inc.*, 2006 WL 2868971 at *4 (citing  *STX, Inc.*, 708 F.Supp.

12  at 1556 (discounting the inconvenience to witnesses who were employees of one of the parties

13  because they could be compelled to testify)); *Hartfield v. Offshore Oil Services, Inc.*, No. CV

14  G-06-275, 2006 WL 2670984, *6 (S.D. Tex. Sept. 14, 2006) ("The Court reiterates that the

15  convenience of key witnesses who are employees of the defendant requesting transfer is 'entitled

16  to less weight because that party will be able to compel their testimony at trial,'" quoting

17  *Continental Airlines, Inc. v. American Airlines, Inc.*, 805 F.Supp. 1392, 1397 (S.D. Tex. 1992));

18  *Worldwide Financial LLP v. Kopko*, No. CV 03-0428 DFH, 2004 WL 771219, *3 (S.D. Ind.

19  Mar. 18, 2004) ("The courts ordinarily assume that the parties will be sufficiently motivated to

20  have their own partners or employees or other allies appear for trial wherever it might take place.

21  Parties may use Rule 45 of the Federal Rules of Civil Procedure to conduct discovery all over the

22  United States, so the principal concern along these lines is to make non-party witnesses available

23  for trial.  The aim is to minimize the risk of 'trial by deposition'" (citations omitted)).

24         "If the [requested] transfer is for the convenience of witnesses, [the] defendant must name

25  the witnesses it wishes to call, the anticipated area of their testimony and its relevance, and the

26  reasons why the present forum would present hardship to them." *Bohara v. Backus Hospital*

27  *Medical Benefit Plan*, 390 F.Supp.2d 957, 963 (C.D. Cal. 2005); see also *Fireman's Fund Ins*.

28  *Co. v. National Bank for Cooperatives*, No. C 92-2667 BAC, 1993 WL 341274, *4 (N.D. Cal.

Aug. 27, 1993) ("The movant is obligated to clearly specify the key witnesses to be called and make at least a generalized statement of what their testimony would have included"); *Musical Latino Americana, S.A. v. Mar Int'l Records, Inc.*, 829 F.Supp. 62, 66-67 (S.D.N.Y. 1993) ("To meet its burden of demonstrating that transfer is in the convenience of the witnesses, the party seeking transfer must specifically list the evidence and witnesses on which the party intends to rely in the transferee district, along with a general statement of the topics of each witness' testimony. Absent such a showing, the motion should be denied" (citations omitted)).

RK and LLL state generally that a majority of their witnesses are located in Florida,[89] while Molloy identifies nine potential witnesses who reside in California.[90]  Because the parties do not explain in any detail the relevance of the anticipated testimony or the necessity of calling these as opposed to other witnesses at trial, it is difficult to evaluate this factor.  Cf. *Pyrocap Intern. Corp. v. Ford Motor Co.*, 259 F.Supp.2d 92, 97-98 (D.D.C. 2003) (finding that the convenience of federal government witnesses based in the District of Columbia was "tangential to the central issues of this case," and concluding that inconvenience to them did not justify denying a motion to transfer the action to Michigan); *TV-3, Inc. v. Royal Ins. Co. of America*, 28 F.Supp.2d 407, 412 (E.D. Tex. 1998) ("[T]he evaluation of [the convenience of witnesses] factor[ ] should not rest on a 'battle of numbers' but should be directed by the content and quality, rather than quantity, of their testimony"); *Anglo American Ins. Group, P.L.C. v. CalFed Inc.*, 916 F.Supp. 1324, 1338-39 (S.D.N.Y. 1996) ("[T]hree of KPMG's five witnesses are identified as likely to testify about issues relating to the quality of KPMG's audit work, rather than the breach of any alleged duty – the issue in the third-party action against KPMG.  Therefore, these witnesses are not central to KPMG's defense . . . [and] KPMG's description of witnesses and other proof is not outcome determinative with regards to evaluating the convenience of witnesses"); *Veterans Foundation, Inc. v. Insurance Co. of North America*, No. 92 C 4426, 1992 WL 297393, *3 (N.D. Ill. Oct. 8, 1992) ("CIGNA's listing of witnesses who are tangential to the central issue fails to

---

[89]Defs.' Motion at 11.

[90]Pl.'s Opp. at 22.

1    persuade this Court of the merits of its motion").

2        Nonetheless, since it is RK's and LLL's burden to identify specific witnesses for whom

3    Florida will be a more convenient forum, the court concludes that this factor weighs against

4    transfer.

5                          **4.    The Location of the Evidence**

6        "If [a] motion [to transfer venue] is based on the location of records and documents, the

7    [defendant] must show with particularity the location, difficulty of transportation, and the

8    importance of such record." *Bohara*, 390 F.Supp.2d at 963.  LLL and RK argue that a

9    substantial majority of their records are located in Florida.[91]  They proffer no evidence, however,

10   regarding the size or nature of the records.  Nor do they explain how transporting copies of the

11   allegedly infringing products, if necessary, would be difficult or costly.  Thus, defendants have

12   not carried their burden of showing that this factor favors transfer to the Southern District of

13   Florida, and it is, at best, neutral.  See *id.*; see also *In re Triton Limited Sec. Litig.*, No.

14   5:98CV256, 1999 WL 787565, *11 (E.D. Tex. Sept. 29, 1999) ("Defendants . . . fail to show

15   that these documents are so voluminous that they would be difficult to transport.  Therefore, the

16   Court does not consider this as an important factor in the transfer analysis"); *Bianco v. Texas

17   Instruments, Inc.*, 627 F.Supp. 154, 165 (N.D. Ill. 1985) ("As for defendants' argument

18   concerning the location of relevant documents, we do not believe that this is a compelling factor,

19   given the ready availability of photocopying and the relative ease with which documents may be

20   selectively shipped around the country"); *Met-L-Wood Corp. v. SWS Indus., Inc.*, 594 F.Supp.

21   706, 710 (N.D. Ill. 1984) (observing that the location of documents is not an important factor

22   "unless documents are so voluminous that their transport is a major undertaking"); cf. *Arrow

23   Elec., Inc. v. Ducommun, Inc.*, 724 F.Supp. 264, 266 (S.D.N.Y. 1989) (denying transfer to a

24   district where defendant's documents were located because doing so would merely shift the

25   transportation burden from defendant to plaintiff).

26

27   _____

28       [91]Defs.' Motion at 11.

1 | **5.    Which Forum's Law Applies**

2 |     Having found the arbitration clause of the Services Agreement to be enforceable, the

3 | Florida choice-of-law provision contained in the contract is valid and may well affect some or all

4 | of Molloy's claims, as that contract (and potentially the Model Release as well) will determine the

5 | extent of the right LLL and RK have to use Molloy's trademarked stage name and image.[92]  While

6 | Molloy has asserted some California claims, as to which this court may have more expertise than

7 | a Florida court, those claims are relatively straightforward, and Florida has statutes that are

8 | similar to the California provisions Molloy has invoked.  See, e.g., FLOR. ANN. STAT. § 540.08

9 | (commercial misappropriation statute);  FLOR. ANN. STAT. §§ 501.201 *et seq*. (Deceptive and

10 | Unfair Trade Practices Act).  A judge in the Southern District of Florida is clearly competent to

11 | hear Molloy's federal claims, moreover, and more competent to apply Florida law to the contracts

12 | at issue than this court.  On balance, therefore, the court concludes that this factor weighs in favor

13 | of transfer.

14 | **6.    The Interests of Justice**

15 |     "The 'interest[s] of justice' include such concerns as ensuring speedy trials, trying related

16 | litigation together, and having a judge who is familiar with the applicable law try the case."

17 | *Heller Financial, Inc. v. Midway Powder Co., Inc.*, 883 F.2d 1286, 1293 (7th Cir. 1989).

18 | Because Molloy's claims against LLL and RK can be litigated only in Florida due to the forum

19 | selection clauses in the Services Agreement and Model Release, this factor clearly favors transfer.

20 | **7.    Administrative Considerations**

21 |     Administrative considerations such as docket congestion are given little weight in this

22 | circuit in assessing the propriety of a § 1404(a) transfer.  See *Gates Learjet Corp. v. Jensen*, 743

23 | F.2d 1325, 1335 (9th Cir. 1984) (forum non conveniens case), cert. denied, 417 U.S. 1066

24 | (1985).  Neither party has presented evidence regarding the relative congestion of court dockets

25 | here and in the Southern District of Florida.  Accordingly, the court will not take this factor into

26 | account in deciding the motion.

27 | 

28 |     [92]Defs.' Motion, Exh. 2 at 32.

43

1

### 8.    Balancing the Discretionary Factors

2    The factors that favor transfer are significant – i.e., the existence of forum selection clauses

3    in the relevant contracts, the fact that the Services Agreement must be interpreted according to

4    Florida law to determine its effect on plaintiff's trademark and unfair competition claims, and the

5    fact that a transfer will avoid piecemeal litigation of closely related claims.  Although plaintiff's

6    choice of forum is entitled to some deference, it is entitled to less in this case because she

7    executed contracts requiring that disputes be resolved in Florida.  Additionally, although the

8    convenience of witnesses weighs against transfer, the court notes that neither party provided

9    sufficient information about potential witnesses to permit a true weighing of the factor.  Given the

10    importance of the factors that favor transfer, and the fact that the weight of the factors against

11    transfer is either undercut or difficult to assess, the court concludes that it is appropriate to

12    transfer the action to the Southern District of Florida.

13

### 9.    The Action Could Originally Have Been Filed in Florida

14    Section 1404 permits the transfer of an action to another district only where the case could

15    originally have been brought in that court.  28 U.S.C. § 1404(a).  In order to effect a transfer,

16    the transferee court must have subject matter jurisdiction and be a proper venue for the action.

17    Additionally, defendants must be subject to personal jurisdiction in the district, and be amenable

18    to service of process there.  See *Shapiro v. Bonanza Hotel Co.*, 185 F.2d 777, 779-81(9th Cir.

19    1950); *A. J. Industries, Inc. v. U.S. District Court for Central Dist. of Cal.*, 503 F.2d 384, 386-

20    88 (9th Cir. 1974).  None of these requirements may be waived by the moving party.  See

21    *Hoffman v. Blaski*, 363 U.S. 335, 342-44 (1960).

22    It appears that each of the criteria is met in the present case.  The district court in Florida

23    York will have subject matter jurisdiction since the case could have been brought as a federal

24    question action in that court.  Venue is proper because the remaining defendants are all Florida

25    citizens.  28 U.S.C. § 1391(b)(1).[93]  The remaining defendants are also amenable to personal

26    ──────────────

27    [93]As noted, plaintiff voluntarily dismissed defendant Namecheap, Inc. on July 14, 2009.

28    The court dismisses the unserved defendants under Rule 4(m) of the Federal Rules of Civil
Procedure without prejudice, as more than 120 days has passed since the complaint was filed, and

1    jurisdiction in Florida.[94]    Accordingly, this prerequisite to transfer is met, and the court

2    determines that transfer to the Southern District of Florida would be appropriate in the interest

3    of justice.[95]

---

plaintiff has not filed proof of service on those defendants.  In any event, venue would be proper as to the unserved defendants in Florida, as each is either a Florida resident or an alien.  See 28 U.S.C. § 1391(b)(1), (b)(3), (d).

[94]It is not clear that the alien defendants would be subject to personal jurisdiction in Florida.  However, it is equally unclear that they would be amenable to personal jurisdiction in California.  Furthermore, the court has now dismissed them from the suit under Rule 4(m).  See *Liberty Mut. Ins. Co. v. Batteast by Batteast*, 113 F.R.D. 77, 82 n. 7 (N.D. Ill. 1986) ("With the dismissal of the misjoined (the Batteasts) and unserved (St. Bernard's Hospital) Illinois defendants, this case has become one which might have been brought in the Southern District of New York").

[95]While defendants' motion under Rule 12(b)(3) sought dismissal, and while the court granted the motion, defendants alternatively sought a transfer of the action under 28 U.S.C. § 1406(a).  See 28 U.S.C. § 1406(a) (" "The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought").  Here, it is in the interests of justice to transfer Molloy's claims rather than dismiss them.  See *Oldlaw Corp. v. Allen*, No. 07-1070, 2007 WL 2772697, *6 (C.D. Ill. Sept. 24, 2007) (stating that transfer was "the better choice," since "[d]ismissing the case would require Plaintiff to start over, which arguably only wastes time, and, in the Court's opinion, would be unfairly harsh.  Transferring the case will preserve its progression thus far (which admittedly is not far, but is at least past filing and service)").

**III.  CONCLUSION**

For the foregoing reasons, the court grants defendants' motion to transfer venue to the Southern District of Florida under Rule 12(b)(3), 28 U.S.C. § 1406(a) and 28 U.S.C. § 1404(a). It directs the clerk to transfer the action forthwith.

DATED: October 8, 2009

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE